UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANITA GOWANS,

    Plaintiff,                                 Case No.

    -vs-                                     Hon.

VHS OF MICHIGAN, INC.,
a foreign corporation doing business as DETROIT
MEDICAL CENTER and VHS
CHILDREN'S HOSPITAL OF MICHIGAN, INC.,
a foreign corporation,

    Defendants.

---

DARCIE R. BRAULT (P43864)
McKnight, Canzano, Smith,
Radtke & Brault, P.C.
3950 W. Eleven Mile Rd.
Berkley, MI 48072
(248) 354-9650
dbrault@michworkerlaw.com

*Attorneys for Plaintiff*

---

## COMPLAINT AND JURY DEMAND

    Plaintiff, Anita Gowans, by her counsel, McKnight, Canzano, Smith, Radtke & Brault, P.C., states as her Complaint against the Defendants VHS of Michigan, Inc., doing business as Detroit Medical Center and VHS Children's Hospital of Michigan, Inc.:

### JURISDICTION AND VENUE ALLEGATIONS

    1.    This is an action brought for Defendants' violations of Plaintiff's civil

rights while she was employed by Defendant VHS of Michigan, Inc., doing business as Detroit Medical Center, and VHS Children's Hospital of Michigan, Inc. The Defendants are hereafter referred to, collectively, as "DMC" or the "DMC."

2.     The DMC violated Plaintiff's right to be free from race discrimination and retaliation for complaining of race discrimination, protected by 42 U.S.C. 2000e, *et seq.,* Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 1981 ("Section 1981") and the Elliott-Larsen Civil Rights Act ("ELCRA"), MCL § 37.2101, *et seq.,* and terminated Plaintiff in violation of the public policy of the State of Michigan.

3.     This Court has jurisdiction over Plaintiff's claims under Title VII and §1981 pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because they arise under the laws of the United States. This Court also has jurisdiction over Plaintiffs' claims under ELCRA and her state law public policy claim pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction) because it forms part of the same case or controversy as the claims under Title VII and §1981.

4.     Plaintiff Anita Gowans ("Gowans") resides in Detroit, Michigan.

5.     Defendant VHS of Michigan, Inc. is a foreign corporation which does business as Detroit Medical Center ("DMC") and is the employer of the workers at Children's Hospital in Detroit, Michigan.

2

6.     Defendant VHS Children's Hospital of Michigan, Inc. is a foreign corporation which does business as Children's Hospital, is part of the DMC and is the employer of workers at Children's Hospital in Detroit, Michigan.

7.     The events giving rise to this cause of action occurred within the Eastern District of Michigan, Southern Division.

### *Facts*

8.     Plaintiff Anita Gowans began her employment at Children's Hospital of Michigan on October 27, 1988.

9.     Children's Hospital later became part of the DMC.

10.     **On her 35th work anniversary**, on October 27, 2023, the DMC terminated Gowans.

11.     Gowans' last job at the DMC was Emergency Department Technician I.

12.     Gowans was experienced and trained.

13.     Before Gowans was wrongfully terminated, she had only ever been subject to one corrective action—a verbal "conference"—and had never received an unsatisfactory performance evaluation.

14.     Indeed, Gowans' performance ratings improved over time, with her last performance evaluation listed as a 4.0/5.0 score ("Above Target/Expectations").

15.     The DMC recognized Gowans for her commitment to client care and professional development numerous times.

16.     For example, on May 6, 2011, DMC presented her with an "Inspiration and Excellence" certificate "[a]n recognition of [her] inspiring commitment and demonstration of excellence in the care of patients and families as a friend of nursing."

17.     DMC was so confident in Gowans' abilities that it trained her to be a Patient Care Associate Preceptor, a role that was trusted only to the most senior and skilled ED Techs.

18.     Gowans was also a long-serving Vice President of her union, AFSCME Council 25/Local 140 ("Union").

19.     Gowans was a fierce advocate for the rights of the members she represented and developed a reputation with her employer as a fighter for the members' rights.

20.     On October 3, 2023, DMC required Gowans to work her entire shift (8 hours) in the lab.

21.     The ED Techs preferred to rotate positions during a shift so that they could render patient care and not be stuck with tedious lab work during the entire shift.

22.     Normally, when the hospital had enough staff on shift, DMC allowed

ED Techs to rotate through different assignments.

23.    Gowans asked her Charge Nurse Walter Rydzewski if she could be rotated out of the lab, since the Emergency Department's occupancy was low.

24.    Rydzewski informed Gowans that Angie Hurst, the Director of Nursing, had specifically instructed him to keep Gowans in the lab for her entire shift.

25.    Most of the ED Techs who DMC fired during Gowans' tenure were black.

26.    DMC rarely required nurses to spend their entire shift in one position when occupancy rates were low yet required ED Techs to do so on a regular basis.

27.    Hurst, and by extension DMC, did not have a business justification for the practice.

28.    Further, Hurst and by extension the DMC, disproportionally burdened ED Techs with this practice—employees who were more likely than RNs to be people of color.

29.    While Gowans worked at the DMC, management positions were occupied primarily by Caucasian managers.

30.    DMC also assigned Gowans and other ED Techs to "patient sit" psychiatric patients, despite that there were entry level employees who were "Patient Sitters."

31.     This task was physically dangerous and required no particular skills, yet Gowans and other ED Techs were frequently asked to do this work.

32.     Gowans had all this in mind on October 3, 2023, the day that Hurst instructed Walter Rydzewski to keep Gowans in the lab when it was clear that DMC had no business reason to keep her there.

33.     Gowans complained to the DMC's Human Resources Director Monique Mike-Tiller about the DMC's disparate treatment in the workplace.

34.     Mike-Tiller told Gowans that she wanted to meet with Gowans and Hurst the next afternoon, October 4, 2023.

35.     Hurst refused to participate and left the meeting.

36.     Mike-Tiller then told Gowans that Hurst no longer wanted to meet with Gowans.

37.     Mike-Tiller did not offer Gowans any other action to progress her complaints.

38.     That same day, Gowans filed a union grievance alleging that DMC management was harassing her because it refused to meet and discuss her complaints of disparate treatment.

39.     In short, Gowans engaged in protected activity under the anti-discrimination statutes by raising the issue of disparate treatment, both internally to Human Resources and through her labor union.

40.     At the same time, because she made the complaint on behalf of herself and others in her bargaining unit, she engaged in collective action, protected under the NLRA, 29 U.S.C. §§ 151-169.

41.     Just over a week later, on October 12, 2023, Gowans worked what would be her last shift at DMC.

42.     Around 3pm, a child was admitted to the Emergency Department (ED) with a severe gunshot wound.

43.     A Trauma Code Plus (TCP)—essentially an "all-hands-on-deck" alert—was called via the overhead public address system.

44.     Per DMC regulations, the TCP automatically triggered a Massive Transfusion Protocol (MTP), meaning that the patient would need a large transfusion of blood as soon as possible.

45.     This meant that a previously scheduled ED Tech would go to the blood bank, retrieve a cart of blood, and return it to the trauma bay within the ED.

46.     On October 12, 2023, Gowans was not the ED Tech scheduled to retrieve blood for MTPs.

47.     ED Tech Stephanie Smith, who was the scheduled ED Tech, was leaving for the end of her shift.

48.     Gowans saw that Gracie Boatwright, the ED Tech who was supposed to take Smith's spot, was assisting another patient with a life-threatening

emergency.

49.     Boatwright asked Gowans to retrieve the blood cooler for the gunshot patient's MTP, which she did.

50.     When Gowans returned from the blood bank, there were so many doctors, nurses, and other hospital staff (approximately 15-20 people) assisting the gunshot patient that Gowans could not reach the patient's bedside.

51.     Hurst and Carrie Harris, the RN Manager, both saw Gowans return with the blood cart from the blood bank.

52.     Gowans made sure to make eye contact with them as she left the blood approximately 5-10 feet from the patient's bed, where another staff member could quickly retrieve it when the team was ready for it.

53.     A few hours after the TCP, Hurst and Harris approached Gowans and told her they wanted to speak with her.

54.     Gowans asked for union representation.

55.     When everyone was assembled, Hurst demanded that Gowans turn in her badge and said that Gowans would be suspended for investigation.

56.     Hurst would not explain why.

57.     Hurst and Harris personally walked Gowans to the locker room to retrieve her things and escorted her out of the building.

58.     She was terminated shortly thereafter on October 27, 2023.

59.     The decision to terminate Gowans was not consistent with how the DMC had dealt with similar instances of leaving blood outside the area of congestion.

60.     In fact, similar instances did not result in any discipline at all.

61.     Gowans' union filed a grievance over the termination.

62.     Gowans also filed an unfair labor practice charge against her former employer on November 10, 2023 (Case No. 07-CA-330156) with the National Labor Relations Board ("NLRB").

63.     The NLRB deferred the charge.

64.     Therefore, whether the DMC violated the NLRA by retaliating against Gowans because of her union activities is to be determined by the arbitrator, in addition to the question of whether there was just cause to terminate her under her collective bargaining agreement.

65.     The employer repeatedly insisted that any resolution of Gowans' grievance with the union must include a waiver of Gowans' rights, including her statutory claims not covered under the collective bargaining agreement.

66.     Gowans refused to waive her statutory rights to be free of discrimination and retaliation.

67.     Gowans filed a charge of race discrimination and retaliation in violation of Title VII of the Civil Rights Act, 42 USC § 2000e *et seq.*, with the

Equal Employment Opportunities Commission (EEOC) (Case No. 471-2024-00918).

68.     While Gowans has requested a "Right to Sue" letter, she has not yet received it.

69.     Gowans will seek to amend her Complaint when she receives the "Right to Sue" letter.

**Count 1**
**VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.***
**(Race Discrimination)**

70.     Plaintiff incorporates paragraphs 1 through 69 above.

71.     Under Section 701(b) of Title VII, 42 U.S.C. § 2000e(b), companies that have fifteen or more employees and are engaged in an industry affecting commerce are employers within the meaning of Title VII.

72.     Under Section 701(f) of Title VII, 42 U.S.C. § 2000e(f), an employee is "an individual employed by an employer ..."

73.     Defendants are employers within the meaning of Title VII because they are each companies with more than fifteen employees that are engaged in industry affecting commerce.

74.     At all times relevant to this action, Gowans was an "employee" under Title VII, 42 U.S.C. § 2000e.

75.     Under Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a), it is

unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race…"

76.    Under Section 703(a)(2) of Title VII, 42 U.S.C. § 2000e-2(a)(2), it is unlawful for an employer "to limit, segregate, or classify his employees … in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race …"

77.    DMC violated Title VII by:

    a.  Treating Plaintiff differently compared to Caucasian workers, including favoring workers for assignments and other work conditions;

    b.  Refusing to meet with Plaintiff to discuss disparate treatment in the workplace;

    c.  Disciplining Plaintiff;

    d.  Terminating Plaintiff; and

    e.  Other acts of discrimination not yet known.

78.    These violations were malicious, willful, or in reckless disregard of Plaintiff's rights under Title VII.

79.    As a direct and proximate result of Defendants' conduct in violation of Title VII, Plaintiff has suffered substantial damages including:

    a.  Economic damages based on her lost wages and fringe benefits,

both past and future;

b. Non-economic damages for injuries such as emotional distress, harm to reputation, embarrassment, humiliation, inconvenience, indignity, outrage, disappointment, and other consequential injuries;

c. Attorney fees and costs; and

d. Other damages to be determined.

WHEREFORE, Plaintiff requests this Court to enter a judgment in her favor as follows:

a. Judgment in an amount that the Court or jury determines to be fair, just, and adequate compensation for the damages that Plaintiff sustained, past and future, together with interest;

b. Equitable relief including an award of front pay, punitive damages, and other relief that the court deems appropriate; and

c. An award of attorney fees and costs.

## Count 2
## VIOLATION OF TITLE VII, 42 U.S.C. § 2000e, *et seq.*
## (Retaliation)

80.     Plaintiff incorporates paragraphs 1 through 79 above.

81.     Title VII prohibits retaliation against an employee because of opposition to discriminatory treatment or because she has made a charge. 42 U.S.C.A. § 2000e-3.

82.     Defendants unlawfully retaliated against Plaintiff by:

a. Refusing to investigate her complaints;

      b.  Targeting Plaintiff for unwarranted discipline;

      c.  Terminating Plaintiff because of her protected activity of opposing discriminatory treatment;

      d.  Insisting that Plaintiff compromise her statutory claims in order to exercise her right to reinstatement through her union; and

      e.  Other acts of retaliation not yet known.

83.    These unlawful acts of retaliation were malicious, willful, or in reckless disregard of Plaintiff's rights under Title VII.

84.    As a direct and proximate result of Defendants' conduct in violation of Title VII, Plaintiff has suffered substantial damages including:

      a.  Economic damages based on her lost wages and fringe benefits, both past and future;

      b.  Non-economic damages for injuries such as emotional distress, harm to reputation, embarrassment, humiliation, inconvenience, indignity, outrage, disappointment, and other consequential injuries;

      c.  Attorney fees and costs; and

      d.  Other damages to be determined.

WHEREFORE, Plaintiff requests this Court to enter a judgment in her favor as follows:

      a.  Judgment in an amount that the Court or jury determines to be fair, just, and adequate compensation for the damages that Plaintiff sustained, past and future, together with interest;

      b.  Equitable relief including an award of front pay, punitive damages, and other relief that the court deems appropriate; and

c.  An award of attorney fees and costs.

## Count 3
## VIOLATION OF 42 U.S.C. § 1981
### (Race Discrimination)

85.  Plaintiff incorporates paragraphs 1 through 84 above.

86.  Under 42 U.S.C. § 1981(a)-(b), an employer is prohibited from

discriminating against a person in "the making, performance, modification, and

termination of contracts, and the enjoyment of all benefits, privileges, terms, and

conditions of the contractual relationship."

87.  Defendants violated § 1981 by:

a.  Treating Plaintiff differently compared to Caucasian workers,
    including favoring workers for assignments and other work
    conditions;

b.  Refusing to meet with Plaintiff to discuss disparate treatment in the
    workplace;

c.  Disciplining Plaintiff;

d.  Terminating Plaintiff; and

e.  Other acts of discrimination not yet known.

88.  These violations were malicious, willful, or in reckless disregard of

Plaintiffs' rights under § 1981.

89.  As a direct and proximate result of Defendants' conduct in violation

of 42 U.S.C. § 1981, Plaintiff has suffered damages including:

a.  Economic damages based on her lost wages and fringe benefits, both past and future;

b.  Non-economic damages for injuries such as emotional distress, harm to reputation, embarrassment, humiliation, inconvenience, indignity, outrage, disappointment, and other consequential injuries;

c.  Attorney fees and costs; and

d.  Other damages to be determined.

WHEREFORE, Plaintiff requests this Court to enter a judgment in her favor as follows:

a.  Judgment in an amount that the Court or jury determines to be fair, just, and adequate compensation for the damages that Plaintiff sustained, past and future, together with interest;

b.  Equitable relief including an award of front pay, punitive damages, and other relief that the court deems appropriate; and

c.  An award of attorney fees and costs.

**Count 4**
**VIOLATION OF 42 U.S.C. § 1981**
**(Retaliation)**

90.    Plaintiff incorporates paragraphs 1 through 89 above.

91.    42 U.S.C. § 1981prohibits retaliation against a person because that person complained of discrimination against themselves or in aid of others.

92.    Defendants unlawfully retaliated against Plaintiff by:

a.  Refusing to investigate her complaints;

b.  Targeting Plaintiff for unwarranted discipline;

     c.  Terminating Plaintiff because of her protected activity of opposing discriminatory treatment;

     d.  Insisting that Plaintiff compromise her statutory claims in order to exercise her right to reinstatement through her union; and

     e.  Other acts of retaliation not yet known.

93.    These unlawful acts of retaliation were malicious, willful, or in reckless disregard of Plaintiff's rights under Title VII.

94.    As a direct and proximate result of Defendants' conduct in violation of Title VII, Plaintiff has suffered substantial damages including:

     a.  Economic damages based on her lost wages and fringe benefits, both past and future;

     b.  Non-economic damages for injuries such as emotional distress, harm to reputation, embarrassment, humiliation, inconvenience, indignity, outrage, disappointment, and other consequential injuries;

     c.  Attorney fees and costs; and

     d.  Other damages to be determined.

WHEREFORE, Plaintiff requests this Court to enter a judgment in her favor as follows:

     d.  Judgment in an amount that the Court or jury determines to be fair, just, and adequate compensation for the damages that Plaintiff sustained, past and future, together with interest;

     e.  Equitable relief including an award of front pay, punitive damages, and other relief that the court deems appropriate; and

     f.  An award of attorney fees and costs.

**Count 5**
**<u>VIOLATION OF ELCRA</u>**
**<u>(Discrimination)</u>**

95.     Plaintiff incorporates paragraphs 1 through 94 above.

96.     Defendants are employers as defined pursuant to §201(a) of the

Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq* (hereinafter "ELCRA").

97.     Pursuant to §202 of the ELCRA, Defendants owed a duty to Plaintiff

not to discharge or otherwise discriminate against her with respect to employment,

compensation, or a term, condition or privilege of employment because of her race.

98.     Defendants violated the ELCRA's prohibition against race

discrimination by taking adverse action toward Plaintiff based upon her race,

including, but not limited to:

  a.  Treating Plaintiff differently compared to Caucasian workers,
      including favoring workers for assignments and other work
      conditions;

  b.  Refusing to meet with Plaintiff to discuss disparate treatment in the
      workplace;

  c.  Disciplining Plaintiff;

  d.  Terminating Plaintiff; and

  e.  Other acts of discrimination not yet known.

99.     As a direct and proximate result of Defendants' conduct in violation

of ELCRA, MCL 37.2101, *et seq*., Plaintiff has suffered damages including:

a. Economic damages based on her lost wages and fringe benefits, both past and future;

b. Non-economic damages for injuries such as emotional distress, harm to reputation, embarrassment, humiliation, inconvenience, indignity, outrage, disappointment, and other consequential injuries;

c. Attorney fees and costs; and

d. Other damages to be determined.

WHEREFORE Plaintiff requests this Court enter judgment in her favor as follows:

a. Judgment in an amount that the Court or jury determines to be fair, just, and adequate compensation for the damages that Plaintiff sustained, past and future, together with interest;

b. An award of attorney fees and costs; and

c. Equitable relief and other relief that the court deems appropriate.

**Count 6**
**VIOLATION OF ELCRA**
**(Retaliation)**

100.   Plaintiff incorporates paragraphs 1 through 99 above.

101.   The ELCRA prohibits retaliation against a person because the person has opposed a violation of the ELCRA or because the person has made a charge or filed a complaint under the ELCRA.

102.   Defendants took adverse action against the Plaintiff because she made complaints of race discrimination on behalf of herself and others by:

    a.  Refusing to investigate her complaints;

    b.  Targeting Plaintiff for unwarranted discipline;

    c.  Terminating Plaintiff because of her protected activity of opposing discriminatory treatment;

    d.  Insisting that Plaintiff compromise her statutory claims in order to exercise her right to reinstatement through her union; and

    e.  Other acts of retaliation not yet known.

103.  As a direct and proximate result of Defendants' conduct in violation of ELCRA, Plaintiff has suffered damages including:

    a.  Economic damages based on her lost wages and fringe benefits, both past and future;

    b.  Non-economic damages for injuries such as emotional distress, harm to reputation, embarrassment, humiliation, inconvenience, indignity, outrage, disappointment, and other consequential injuries;

    c.  Attorney fees and costs; and

    d.  Other damages to be determined.

WHEREFORE Plaintiff requests this Court enter judgment in her favor as follows:

    a.  Judgment in an amount that the Court or jury determines to be fair, just, and adequate compensation for the damages that Plaintiff sustained, past and future, together with interest;

    b.  An award of attorney fees and costs; and

    c.  Equitable relief and other relief that the court deems appropriate.

**Count 7**
**WRONGFUL DISCHARGE IN VIOLATION**
**OF PUBLIC POLICY**

104.   Plaintiff incorporates paragraphs 1 through 103, above.

105.   An employee may bring a suit for wrongful discharge if the employer's reason for termination violates public policy. *Lewandowski v Nuclear Mgmt. Co.*, 272 Mich App 120, 127 (2022).

106.   A violation of public policy occurs when: … the employee is discharged for exercising a well-established statutory right." *Id.*

107.   A public-policy violation can be premised on a violation of a federal statute.

108.   Gowans has a statutory right to engage in concerted activity for mutual aid and protection. 29 U.S.C. § 157.

109.   DMC took adverse action against Gowans because of her concerted activity in complaining about the disparate treatment of others in her bargaining unit by:

    a.  Refusing to investigate her complaints;

    b.  Targeting Plaintiff for unwarranted discipline;

    c.  Terminating Plaintiff because of her protected activity of opposing discriminatory treatment;

    d.  Insisting that Plaintiff compromise her statutory claims in order to exercise her right to reinstatement through her union; and

20

e. Other acts of retaliation not yet known.

110. As a direct and proximate result of Defendants' conduct in violation of public policy, Plaintiff has suffered damages including:

a. Economic damages based on her lost wages and fringe benefits, both past and future;

b. Non-economic damages for injuries such as emotional distress, harm to reputation, embarrassment, humiliation, inconvenience, indignity, outrage, disappointment, and other consequential injuries;

c. Attorney fees and costs; and

d. Other damages to be determined.

111. Plaintiff's public policy claim is not preempted because the NLRB deferred its jurisdiction of the unfair labor practice and because the remedies provided under the NLRA are inadequate to constitute exclusive remedies that preempt public-policy claims because they fail to provide employees with sufficient redress. *Stegall v. Res. Tech. Corp.,* No. 165450, 2024 WL 3503503, at *10 (Mich. July 22, 2024).

WHEREFORE Plaintiff requests this Court enter judgment in her favor as follows:

a. Judgment in an amount that the Court or jury determines to be fair, just, and adequate compensation for the damages that Plaintiff sustained, past and future, together with interest;

b. An award of attorney fees and costs; and

c. Equitable relief and other relief that the court deems appropriate.

Respectfully submitted,

McKNIGHT, CANZANO, SMITH
RADTKE & BRAULT, P.C.

By:   */s/ Darcie R. Brault*
      Darcie R. Brault (P43864)
      Attorneys for Plaintiff
      3950 W. 11 Mile Road
      Berkley, MI  48072
      (248) 354-9650
      dbrault@michworkerlaw.com

Dated:  November 1, 2024

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

McKNIGHT, CANZANO, SMITH
RADTKE & BRAULT, P.C.

By:   /s/ *Darcie R. Brault*
    Darcie R. Brault (P43864)
    *Attorneys for Plaintiff*
    3950 W. Eleven Mile Rd.
    Berkley, MI 48072
    (248) 354-9650
    dbrault@michworkerlaw.com

Dated: November 1, 2024